113 Cal.Rptr.2d 175 (2001)
93 Cal.App.4th 363
Bill CHAVEZ et al., Plaintiffs and Appellants,
v.
WHIRLPOOL CORPORATION et al., Defendants and Respondents.
No. B136778.
Court of Appeal, Second District, Division Three.
October 29, 2001.
Review Denied February 13, 2002.
*177 Lakeshore Law Center, Jeffrey Wilens, Irvine; Anderson & Anderson and Martin W. Anderson, Santa Ana, for Plaintiffs and Appellants.
Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Thomas Greene, Assistant Attorney General, Barbara M. Motz and Quyen D. Nguyen, Deputy Attorneys General, for the State of California as Amicus Curiae on behalf of Plaintiff and Appellant.
Gibson, Dunn & Crutcher, Irvine, William E. Wegner, Daniel S. Floyd and William A. Wargo, Los Angeles, for Defendant and Respondent Whirlpool Corporation.
McNamara & Spira and Michael P. McNamara, Santa Monica, for Defendant and Respondent Howard's.
*176 KITCHING, J.
Plaintiff Bill Chavez appeals a judgment dismissing his complaint against defendants Whirlpool Corporation (Whirlpool) and Howard's after the court sustained a demurrer without leave to amend. He alleges that Whirlpool has required Howard's and other retailers to maintain minimum resale prices for its products and contends the practice constitutes an unlawful combination under the Cartwright Act (Bus. & Prof.Code, § 16700 et seq.) and an unlawful and unfair business practice *178 under the unfair competition law (Bus. & Prof.Code, § 17200 et seq.).
We conclude that the complaint fails to state a cause of action for violation of the Cartwright Act because the alleged conduct is permissible under the Colgate doctrine (United States v. Colgate & Co. (1919) 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (Colgate)), and the facts pleaded are insufficient to establish a coerced agreement. We also conclude that conduct that is permissible under the Colgate doctrine is neither unlawful nor "unfair" under the unfair competition law, so the complaint fails to state a cause of action for violation of the unfair competition law. We therefore affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND
Whirlpool manufactures household appliances, including KitchenAid dishwashers. Howard's is a retailer. Chavez is a consumer who purchased a KitchenAid product from Howard's.
Chavez sued Whirlpool and Howard's in May 1999 on behalf of himself, others similarly situated, and the general public alleging that the defendants had agreed to maintain minimum resale prices for KitchenAid dishwashers. The complaint alleges causes of action for violation of the Cartwright Act and the unfair competition law.
Chavez alleges that Whirlpool announced a KitchenAid Unilateral Price Policy (the price policy) prescribing minimum resale prices for KitchenAid products and informed Howard's and other retailers that it would monitor their compliance and would refuse to sell KitchenAid products to any retailer who failed to comply. He alleges that Whirlpool advised the retailers that there would be "no second chances" and that any single violation of the price policy would result in the termination of sales to the individual retail store and to all of the retailer's other stores. He further alleges that Howard's agreed to implement the price policy and maintained the minimum resale prices, although Howard's normally discounted its products, and that Howard's announced to its employees that the policy would benefit Howard's and its employees. He alleges in the alternative that even if Howard's did not voluntarily agree to maintain the minimum resale prices, it agreed under coercion and the threat that Whirlpool would terminate sales to Howard's.
Whirlpool demurred to the complaint on the ground that the alleged conduct was lawful. Howard's joined in the demurrer. Whirlpool argued that under the Colgate doctrine, if a manufacturer unilaterally announces a minimum resale price policy and a retailer unilaterally complies with the policy, there is no agreement or combination under the Cartwright Act and no Cartwright Act violation unless the manufacturer employed coercive tactics to enforce compliance. It argued that Chavez's allegations of an agreement and coercion were either too vague and conclusory to state a valid claim or alleged specific conduct that was lawful. It argued further that the complaint did not allege an unlawful or unfair business practice under the unfair competition law because the alleged conduct did not violate the Cartwright Act, threaten an incipient violation of the law, or violate the policy or spirit of the law.
Chavez responded that an unlawful combination under the Cartwright Act exists when a manufacturer coerces a retailer to comply involuntarily with minimum resale prices, and that the complaint adequately alleges coercion. He argued that the complaint could be amended, if necessary, to allege more specific coercive acts after the completion of some discovery. With respect to the unfair competition cause of action, he argued that the price policy is *179 "unlawful" because it violates the Cartwright Act and that it is "unfair" because the harm to consumers outweighs the benefits.
The trial court determined that under the Colgate doctrine, Whirlpool's announcement of the price policy and the retailers' alleged acquiescence in the policy were unilateral actions that did not constitute an agreement, and that the complaint did not allege other conduct beyond the announcement of the price policy that would create an unlawful combination. It concluded that since the alleged conduct was permissible under the Cartwright Act, it was neither unlawful nor unfair for purposes of the unfair competition law. The court therefore sustained the demurrer without leave to amend and dismissed the action.

CONTENTIONS
Chavez contends (1) the complaint adequately alleges that Whirlpool coerced retailers to comply with the price policy, creating an unlawful combination under the Cartwright Act; (2) the price policy is "unlawful" under the unfair competition law because it violates the Cartwright Act, and it is "unfair" because the harm to consumers outweighs the benefits; and (3) the court abused its discretion by denying leave to amend the complaint to allege additional facts to support both causes of action.

DISCUSSION

1. Standard of Review
On appeal from a judgment dismissing a complaint after a demurrer is sustained without leave to amend, we assume the truth of properly pleaded factual allegations and determine de novo whether the complaint alleges facts sufficient to state a cause of action on any legal theory. (Blank v. Kirwan (1985) 39 Cal.3d 311, 318, 216 Cal.Rptr. 718, 703 P.2d 58; Venice Town Council, Inc. v. City of Los Angeles (1996) 47 Cal.App.4th 1547, 1557, 55 Cal.Rptr.2d 465.) It is an abuse of discretion to sustain a demurrer if there is a reasonable possibility that the defect can be cured by amendment. (Blank, at p. 318, 216 Cal.Rptr. 718, 703 P.2d 58.) The burden is on the plaintiff to demonstrate how the complaint can be amended to state a valid cause of action. (Ibid.)

2. The Cartwright Act Claim

A. Legal Background
The Cartwright Act prohibits every trust, defined as "a combination of capital, skill or acts by two or more persons" for specified anticompetitive purposes. (Bus. & Prof.Code, §§ 16720, 16726.) The federal Sherman Act prohibits every "contract, combination .... or conspiracy, in restraint of trade." (15 U.S.C. § 1.) The similar language of the two acts reflects their common objective to protect and promote competition. (State of California ex rel. Van de Kamp v. Texaco, Inc. (1988) 46 Cal.3d 1147, 1153, 252 Cal.Rptr. 221, 762 P.2d 385; Business Electronics v. Sharp Electronics (1988) 485 U.S. 717, 726, 108 S.Ct. 1515, 99 L.Ed.2d 808 [emphasizing interbrand competition].) Since the Cartwright Act and the federal Sherman Act share similar language and objectives, California courts often look to federal precedents under the Sherman Act for guidance. (Morrison v. Viacom, Inc. (1998) 66 Cal.App.4th 534, 541, fn. 2, 78 Cal.Rptr.2d 133.)
California and federal antitrust law under the two acts generally distinguish between conduct that is per se unlawful and conduct that is evaluated under the rule of reason. The law conclusively presumes manifestly anticompetitive restraints of trade to be unreasonable and *180 unlawful, and evaluate other restraints under the rule of reason. (Marin County Bd. of Realtors, Inc. v. Palsson (1976) 16 Cal.3d 920, 930-931, 130 Cal.Rptr. 1, 549 P.2d 833; Business Electronics v. Sharp Electronics, supra, 485 U.S. at pp. 723-724, 108 S.Ct. 1515.)
An agreement between a manufacturer or supplier and distributors or retailers to maintain minimum resale prices is per se unlawful under both the Cartwright Act and the Sherman Act. (Business Electronics v. Sharp Electronics, supra, 485 U.S. at p. 724, 108 S.Ct. 1515; cf. Mailand v. Burckle (1978) 20 Cal.3d 367, 377-378, 143 Cal.Rptr. 1, 572 P.2d 1142 [held that a minimum resale price agreement between a franchisor and a franchisee was per se unlawful under the Cartwright Act].) The United States Supreme Court has stated that resale price maintenance, a vertical restraint, destroys horizontal competition as effectively as would a horizontal agreement among distributors or retailers. (California Liquor Dealers v. Midcal Aluminum (1980) 445 U.S. 97, 103, 100 S.Ct. 937, 63 L.Ed.2d 233; Dr. Miles Medical Co. v. Park & Sons Co. (1911) 220 U.S. 373, 408, 31 S.Ct. 376, 55 L.Ed. 502.)
A resale price maintenance agreement can be inferred from certain conduct. (Monsanto Co. v. Spray-Rite Service Corp. (1984) 465 U.S. 752, 764, 768, 104 S.Ct. 1464, 79 L.Ed.2d 775 (Monsanto).) The conduct from which an agreement can be inferred is circumscribed as a matter of law in order to protect a manufacturer's right to select with whom to do business and on what terms. (Id at pp. 761, 763, 104 S.Ct. 1464.) This is known as the Colgate doctrine, arising from Colgate, supra, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992. As the United States Supreme Court stated in Monsanto, "Under Colgate, the manufacturer can announce its resale prices in advance and refuse to deal with those who fail to comply. And a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination." (Monsanto, at p. 761, 104 S.Ct. 1464.) California courts have adopted the Colgate doctrine for purposes of applying the Cartwright Act. (Bert G. Gianelli Distributing Co. v. Beck & Co. (1985) 172 Cal.App.3d 1020, 1042-1043, 219 Cal.Rptr. 203; G.H.I.I. v. MTS, Inc. (1983) 147 Cal. App.3d 256, 267-268, 195 Cal.Rptr. 211; Rolling v. Dow Jones & Co. (1982) 137 Cal.App.3d 709, 720-721, 187 Cal.Rptr. 797; R.E. Spriggs Co. v. Adolph Coors Co. (1979) 94 Cal.App.3d 419, 425-426, 156 Cal. Rptr. 738.)
In Monsanto, supra, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775, a distributor of agricultural chemicals alleged that the manufacturer had terminated the distributorship pursuant to a resale price maintenance agreement with other distributors. The jury found that the manufacturer had violated the Sherman Act, and the circuit court of appeals affirmed the judgment, holding that the manufacturer's termination of the distributorship in response to complaints from other distributors was sufficient evidence from which to infer a conspiracy to set resale prices. (Monsanto, at pp. 757-759, 104 S.Ct. 1464.) The Supreme Court rejected that analysis but affirmed the judgment based on a more rigorous standard of proof designed to distinguish "independent action by the manufacturer" from "price-fixing agreements." (Id. at pp. 759, 763,104 S.Ct. 1464.)
The Monsanto court first distinguished between "concerted and independent action." (Monsanto, supra, 465 U.S. at p. 761, 104 S.Ct. 1464.) It noted the statutory requirement of a "`contract, combination .... or conspiracy'" to establish a Sherman Act violation, and stated that the act therefore does not proscribe independent action. (Monsanto, at p. 761, 104 *181 S.Ct. 1464, citing 15 U.S.C. § 1.) It also distinguished between price and nonprice restrictions, noting that the former are per se illegal while the latter are judged under the rule of reason. (Monsanto, at p. 761, 104 S.Ct. 1464.)
The Monsanto court stated that the distinctions between concerted and independent action and between price and nonprice restrictions are difficult to apply in practice, and acknowledged that the economic impact of both proscribed and permitted behavior in many cases may be the same and that the parties' conduct may be indistinguishable. (Monsanto, supra, 465 U.S. at p. 762, 104 S.Ct. 1464.) It noted that a manufacturer and its distributors may have legitimate reasons to discuss resale prices and marketing strategy and to maintain reasonable nonprice restrictions that may affect resale prices. (Id. at pp. 762-763, 104 S.Ct. 1464, citing Continental T. V., Inc. v. GTE Sylvania Inc. (1977) 433 U.S. 36, 55, 97 S.Ct. 2549, 53 L.Ed.2d 568.) Nonprice restrictions affecting resale prices may help to ensure that retailers promote products and offer services, and may help to avoid "`free riders.'" (Monsanto, at pp. 762-763, 104 S.Ct. 1464; Sylvania, at p. 55, 97 S.Ct. 2549.) "Nevertheless," the Monsanto court stated, it is important to distinguish between independent action, concerted action on nonprice restrictions, and "price-fixing agreements, since under present law the latter are subject to per se treatment and treble damages...." If an inference of such an agreement may be drawn from highly ambiguous evidence, there is a considerable danger that the doctrines enunciated in Sylvania and Colgate will be seriously eroded. (Monsanto, at p. 763, 104 S.Ct. 1464.)
The court concluded as a matter of law that to permit the inference of a price fixing agreement based solely on a manufacturer's termination of a distributorship in response to a complaint from another distributor would unduly inhibit legitimate conduct by manufacturers. (Monsanto, supra, 465 U.S. at pp. 763-764 & fn. 8, 104 S.Ct. 1464.) It stated that there must be some other evidence showing that the manufacturer and distributors were not acting independently, but had achieved "`a meeting of the minds'" or "`a common scheme.'" (Id. at p. 764 & fn. 9, 104 S.Ct. 1464.) It stated that the fact that a distributor had conformed to a suggested retail price is insufficient to support an inference of an agreement to maintain resale prices without some other evidence, and that "evidence must be presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer." (Id. at p. 764, fn. 9, 104 S.Ct. 1464.)
The court stated that evidence of a resale price maintenance agreement must "tend[ ] to exclude the possibility that the manufacturer and nonterminated distributors were acting independently" and must "reasonably tend[ ] to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." (Monsanto, supra, 465 U.S. at pp. 764, 768, 104 S.Ct. 1464.) It concluded that in the case before it there was sufficient direct and circumstantial evidence of an agreement and sufficient evidence to show that the termination was pursuant to that agreement. (Id. at pp. 765-767, 104 S.Ct. 1464.) The direct evidence of an agreement was that the manufacturer had notified price-cutting distributors that they would not receive adequate supplies if they did not maintain the suggested retail price and later instructed a noncompliant distributor to comply, and the distributor then informed the manufacturer that it would charge the suggested price. (Id, at p. 765, *182 104 S.Ct. 1464.) There also was evidence that the manufacturer had sought an agreement from and threatened to cut off the distributor at a particularly vulnerable time "as a lever to force compliance." (Id. at p. 765, fn. 10, 104 S.Ct. 1464.) The court also noted that a newsletter circulated by a distributor to his customers could be construed to refer to a price-fixing agreement among the distributors and the manufacturer. (Id. at p. 766, 104 S.Ct. 1464.)
The standard of proof articulated in Monsanto is based largely on the court's desire to protect the right of a manufacturer, under the Colgate doctrine, to announce resale prices and refuse to deal with dealers who do not comply, and the dealers' freedom to acquiesce in the manufacturer's demand in order to avoid termination. (Monsanto, supra, 465 U.S. at pp. 761, 763, 104 S.Ct. 1464.) Monsanto therefore reaffirms that principle and imposes a heightened standard of proof to establish an implied agreement on resale prices. (Accord, Matsushita Elec. Industrial Co. v. Zenith Radio (1986) 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538.)
Thus, a manufacturer's announcement of a resale price policy and its refusal to deal with dealers who do not comply coupled with the dealers' voluntary acquiescence in the policy does not constitute an implied agreement or an unlawful combination as a matter of law. (Monsanto, supra, 465 U.S. at p. 761, 104 S.Ct. 1464; United States v. Parke, Davis & Co. (1960) 362 U.S. 29, 44, 80 S.Ct. 503, 4 L.Ed.2d 505.) An unlawful combination arises, however, if the manufacturer goes beyond those measures by seeking communication of a dealer's acquiescence or agreement to secure the dealer's compliance, such as by means of coercion, and the dealer so communicates. (Monsanto, at pp. 764, fn. 9, 765, fn. 10, 104 S.Ct. 1464; Simpson v. Union Oil Co. (1964) 377 U.S. 13, 17, 84 S.Ct. 1051, 12 L.Ed.2d 98; Parke, Davis & Co., at pp. 46-47, 80 S.Ct. 503.)
The question here is whether the facts alleged in the complaint are sufficient to allege an unlawful combination under the Cartwright Act based on a resale price maintenance agreement.

B. The Sufficiency of the Complaint
A cause of action for violation of the Cartwright Act "`"must allege (1) the formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts. [Citations.]"'" (Quelimane Co. v. Stewart Title Guaranty Co. (1998) 19 Cal.4th 26, 47, 77 Cal.Rptr.2d 709, 960 P.2d 513.) Whirlpool challenges only the first element.
Chavez alleges that Whirlpool announced the price policy prescribing minimum resale prices for KitchenAid products in February 1999 and informed retailers that it would refuse to sell products to any retailer who did not comply. He further alleges that Whirlpool announced that it would monitor the retailers' compliance with the policy by reviewing their advertising, collecting sales receipts, and sending "mystery shoppers" to retail stores, and that it employed other unspecified "threats, coercion, intimidation and boycott" to cause the dealers to comply. The facts pleaded are insufficient to establish a coerced agreement in violation of the Cartwright Act and allege only behavior permitted under the Colgate doctrine.
Just as the announcement of a resale price policy and refusal to deal with dealers who do not comply is permissible, measures to monitor compliance that do not interfere with the dealers' freedom of choice are permissible. To hold otherwise would render the manufacturer's announced policy ineffective and undermine *183 rights protected by the Colgate doctrine, and could also result in the mistaken and arbitrary termination of dealers. By monitoring the dealers' compliance without forcing compliance or seeking and receiving communication of their compliance, a manufacturer permissibly exercises its right to select with whom to do business and on what terms. In this manner, a manufacturer who announces a resale price policy and enforces the policy by monitoring the dealers' compliance and refusing to deal with dealers who do not comply does not violate the Cartwright Act.

C. Leave to Amend
Chavez contends the complaint can be amended to state a valid cause of action by alleging that after Whirlpool announced the end of the price policy, Howard's resumed selling at lower prices. This additional allegation is simply the obverse of the allegation that Howard's began to comply with the price policy after Whirlpool's original announcement and does not support a cause of action for violation of the Cartwright Act for the same reasons.

3. The Unfair Competition Claim

Section 17200 of the Business and Professions Code defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or practice." The broad scope of the statute encompasses both anticompetitive business practices and practices injurious to consumers. (Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co. (1999) 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (Cel-Tech).) An act or practice may be actionable as "unfair" under the unfair competition law even if it is not "unlawful." (Ibid.)
The complaint does not allege a valid Cartwright Act violation to establish an "unlawful" act or practice, as explained ante. The remaining question is whether the complaint adequately alleges an "unfair" act or practice.
The California Supreme Court in Cel-Tech, supra, 20 Cal.4th 163, 83 Cal. Rptr.2d 548, 973 P.2d 527 held that conduct that the Legislature has determined to be lawful cannot be "unfair" under the unfair competition law. (Id. at p. 183, 83 Cal.Rptr.2d 548, 973 P.2d 527.) Although conduct may be "unfair" even if there is no statute prohibiting the conduct, conduct is not actionable under the unfair competition law if a statute expressly precludes an action based on the conduct. (Id. at pp. 183-184, 83 Cal.Rptr.2d 548, 973 P.2d 527.)
The Cel-Tech court was critical of the definitions of "unfair" articulated in People v. Casa Blanca Convalescent Homes, Inc. (1984) 159 Cal.App.3d 509, 530, 206 Cal. Rptr. 164 ("[A]n `unfair' business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers") and State Farm Fire & Casualty Co. v. Superior Court (1996) 45 Cal.App.4th 1093, 1104, 53 Cal.Rptr.2d 229 ("`the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim'") as too vague, amorphous, and uncertain. (Cel-Tech, supra, 20 Cal.4th at pp. 184-185, 83 Cal.Rptr.2d 548, 973 P.2d 527.) It noted that a poorly defined standard of what is "unfair" under the unlawful competition law "may even lead to the enjoining of pro competitive conduct and thereby undermine consumer protection, the primary purpose of the antitrust laws." (Id. at p. 185, 83 Cal. Rptr.2d 548, 973 P.2d 527.)
The Cel-Tech court concluded that an act or practice is "unfair" under the unfair *184 competition law only if the conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition. [Fn. omitted.]" (Cel-Tech, supra, 20 Cal.4th at p. 187, 83 Cal.Rptr.2d 548, 973 P.2d 527.) Cel-Tech involved an action by sellers of cellular telephones against a competitor, and the court stated that its discussion was limited to an action by a competitor, as opposed to an action by a consumer. (Id. at pp. 186-187 & fn. 12, 83 Cal.Rptr.2d 548, 973 P.2d 527.)
We need not decide whether the Cel-Tech test applies in the present action by a consumer because we conclude as a matter of law that conduct that the courts have determined to be permissible under the Colgate doctrine cannot be deemed "unfair" under the unfair competition law.
The purpose of federal and state antitrust laws is to protect and promote competition for the benefit of consumers. (NCAA v. Board of Regents of Univ. of Okla. (1984) 468 U.S. 85, 106-107, 104 S.Ct. 2948, 82 L.Ed.2d 70; Cianci v. Superior Court (1985) 40 Cal.3d 903, 918-919, 221 Cal.Rptr. 575, 710 P.2d 375.) Antitrust laws are designed to prohibit only unreasonable restraints of trade, meaning conduct that unreasonably impairs competition and harms consumers. (Business Electronics v. Sharp Electronics, supra, 485 U.S. at p. 723, 108 S.Ct. 1515; Marin County Bd. of Realtors, Inc. v. Palsson, supra, 16 Cal.3d at p. 930, 130 Cal.Rptr. 1, 549 P.2d 833.) If the same conduct is alleged to be both an antitrust violation and an "unfair" business act or practice for the same reasonbecause it unreasonably restrains competition and harms consumersthe determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not "unfair" toward consumers. To permit a separate inquiry into essentially the same question under the unfair competition law would only invite conflict and uncertainty and could lead to the enjoining of procompetitive conduct. (See Cel-Tech, supra, 20 Cal.4th at p. 185, 83 Cal.Rptr.2d 548, 973 P.2d 527.)
We do not hold that in all circumstances an "unfair" business act or practice must violate an antitrust law to be actionable under the unfair competition law. Instead we hold that conduct alleged to be "unfair" because it unreasonably restrains competition and harms consumers, such as the resale price maintenance agreement alleged here, is not "unfair" if the conduct is deemed reasonable and condoned under the antitrust laws.

DISPOSITION
The judgment is affirmed. Whirlpool shall recover its costs on appeal.
We concur: CROSKEY, Acting P.J. and ALDRICH, J.